IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREATER APPALACHIAN LLAMA AND
ALPACA ASSOCIATION,

and

INTERNATIONAL LAMA REGISTRY,

and

PHIL and LINDA NUECHTERLEIN,

      Plaintiffs,

    v.

AURELIA SKIPWITH, in her official
capacity as Acting Director of the United
States Fish and Wildlife Service,

and

GREG SIEKANIEK, in his official capacity
as Acting Regional Director of the United
States Fish and Wildlife Service,

and

UNITED STATES FISH AND WILDLIFE
SERVICE,

and

UNITED STATES DEPARTMENT OF
INTERIOR,

and

DAVID BERNHARDT, in his official
capacity as Secretary of Interior,

      Defendants.

Case No:  1:20-cv-03106

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Greater Appalachian Llama and Alpaca Association ("GALA"), International Lama Registry ("ILR"), and Phil and Linda Nuechterlein ("the Nuechterleins") (collectively "Plaintiffs") state as follows:

## INTRODUCTION

1.      On August 31, 2020, the United States Fish and Wildlife Service ("FWS") published a Final Rule at 85 F.R. § 54076 and 50 C.F.R § 71, which, among other things, prohibits domestic sheep, goat, and camelid pack animals, including llamas, on the Arctic National Wildlife Refuge ("ANWR") (the "Rule").

2.      Camelids are members of the family Camelidae, and include camels, llamas, alpacas, and certain other animals.  For purposes of this Complaint, Plaintiffs challenge the Rule as applied to llamas only.

3.      Domestic sheep and goat are members of the family Bovidae, and are commonly referred to as domestic ruminant livestock.  Llamas are not domestic ruminant livestock.

4.      This Complaint seeks to protect the llama population, and those who rely upon it for recreation and commercial purposes, from serious harm.  The Complaint challenges the inclusion of llamas in the ANWR prohibition as arbitrary and capricious because the action is based on hypothetical conclusions and insufficient facts rather than scientific evidence.  The Rule, which bans llamas based on an erroneous concern regarding disease transmission, endangers the continued existence of llamas as pack animals, as zoo residents, and as guard animals for domestic sheep flocks, and for other purposes.  The entire llama population is at severe risk due to this action and it must be set aside.

5.      As described in depth below, Plaintiffs are severely harmed by FWS's failure to comply with state and federal regulatory rulemaking processes.

## JURISDICTION AND VENUE

6.      Plaintiffs seek judicial review of agency action pursuant to 5 U.S.C. § 702-706, a declaratory judgment pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 5 U.S.C. § 705.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8.      Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1).

## PARTIES

9.      Plaintiff GALA is a non-profit organization registered in the Commonwealth of Pennsylvania.  GALA is the largest regional association for llama and alpaca owners.  GALA has members in 31 states, including Alaska.  GALA has an annual Education Conference and takes an active interest in areas of camelid health, training, farm management and all uses of llamas, including fiber, packing/trekking, animal-assisted therapy, carting, and showing.

10.      GALA members use llamas as pack animals for hunting, fishing, camping, and wilderness trekking in the ANWR.  GALA brings this action on behalf of itself and its members. As set forth in detail herein, GALA and its members submitted comments to FWS in connection with the Rule.  The Rule adversely affects GALA's members because the Rule forces llama owners to stop using llamas and cease hunting and fishing activities involving llamas in the ANWR.

11.      The effects of this Rule are not confined to the ANWR.  This Rule also threatens the llama species and industry as a whole because it mislabels llamas as disease vectors, which will serve as the leading statement for the undesirability of llamas as reservoirs of disease to

wildlife and domestic animals.  The Rule therefore threatens the continued use of llamas as pack animals throughout the United States because scientifically unsupported llama bans will spread to other regions.

12.     Plaintiff ILR is a non-profit corporation with its principal place of business in Montana.  ILR is the official registry for llamas in the United States and several countries.  The ILR is responsible for recording and maintaining llama birth and death records, the genealogy of each registered animal, international census records, and owner statistics.  The Rule adversely affects ILR because it will cause a loss in llama breeding, llama sales, and llama registration if llamas are identified as a disease threat and prohibited as pack animals on public lands.

13.     Plaintiff Phil Nuechterlein is a resident of Alaska and a long-time authorized user of pack llamas in Alaska, including in the ANWR.  The Rule adversely affects Mr. Nuechterlein because he can no longer use his llama pack animals in the ANWR.

14.     Plaintiff Linda Nuechterlein is a resident of Alaska and a long-time authorized user of pack llamas in Alaska, including in the ANWR.  The Rule adversely affects Ms. Nuechterlein because she can no longer use her llama pack animals in the ANWR.

15.     Defendant Aurelia Skipworth is named in her official capacity as the Acting Director of the U.S. Fish and Wildlife Service.  As such, she is charged with administering the Administration Act, the Improvement Act, and the Recreation Act as those laws apply to fish and wildlife in national wildlife refuges, including wild sheep and goats.

16.     Defendant Greg Siekaniek is named in his official capacity as the Regional Director of the U.S. Fish and Wildlife Service in the Alaska Region.  The Alaska Region includes the Arctic National Wildlife Refuge.  As such, Mr. Siekaniek is responsible for enforcing the Rule in the ANWR.

17.     Defendant U.S. Fish and Wildlife Service ("FWS") is the federal government agency responsible for implementing and enforcing a variety of federal wildlife laws, including the Rule.

18.     Defendant United States Department of Interior ("DOI") is an executive department of the United States Government organized and existing under 5 U.S.C. 101, as amended.  DOI is responsible for, among other things, the supervision, management, direction, and oversight of FWS, which is a federal agency subsidiary of the DOI, pursuant to the provisions of 16 U.S.C. 742b et seq.

19.     Defendant David Bernhardt is named in his official capacity as the United States Secretary of the Interior ("Secretary").

## OTHER RELEVANT ENTITIES

20.     The ANWR is administered by the FWS as a unit of the National Wildlife Refuge System.  It covers approximately 19.64 million acres of land and water in northeastern Alaska.

## FACTUAL BACKGROUND

*Statutory and Regulatory Structure*

21.     The statutory authority of the FWS is governed by 16 U.S.C. 742, *et seq*.

22.     Pursuant to 16 U.S.C. 742f(a), "the Secretary of the Interior, with such advice and assistance as he may require from the Assistant Secretary for Fish and Wildlife, shall consider and determine the policies and procedures that are necessary and desirable in carrying out efficiently and in the public interest the laws relating to fish and wildlife."

23.     The National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. §§ 668dd-668ee (the "Administration Act"), as amended by the National Wildlife Refuge System

Improvement Act of 1997 (the "Improvement Act"), governs the administration and public use of refuges.

24.     The Administration Act closes National Wildlife Refuges ("NWRs") in all States except Alaska to all uses until opened.

25.     The Refuge Recreation Act of 1962, 16. U.S.C. §§ 460k-460k-4 ("Recreation Act") governs the administration and public use of refuges and hatcheries.

26.     The Administration Act and Recreation Act authorize the Secretary to issue regulations to carry out the purposes of the Acts and regulate their uses.

27.     The Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101, *et seq*. ("ANILCA"), governs the administration of public lands, including refuges, in Alaska.  For refuges in Alaska, FWS regulates the uses of refuge lands in compliance with ANILCA.  Section 1110(a) of ANILCA governs FWS's authority to regulate the use of non-motorized surface transportation in Alaska.  FWS may only close an area to non-motorized transportation uses if it finds that such use would be detrimental to the resource values of the area.  Section 1110(a) of ANILCA also requires FWS to do extensive public outreach and provide opportunities for public comment if it needs to close or restrict a public use or mode of access in an Alaskan NWR. Regulations 43 C.F.R. § 36.11 and 43 C.F.R. § 36.42 implement Section 1110(a) of ANILCA.

28.     The National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") is a procedural statute designed to ensure that federal agencies fully consider the environmental impact of decisions during the deliberative rulemaking process.  NEPA requires federal agencies to provide extensive and specific public notice of proposed rules and to permit meaningful public input in the decision-making process.  Specifically, under 40 C.F.R. § 1506.6, agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA

procedures," and "provide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." Agencies must notify those who have requested notice on an individual action.  For national concerns, agencies must provide notice in the Federal Register.  For local concerns, notice may include notice to local agencies that may be interested or affected by the proposed action and notice to potentially interested community organizations including small business associations, among other requirements.

29.     The Administrative Procedure Act, 5. U.S.C. § 500 et seq. ("APA"), which applies to all executive branch and independent agencies, governs the procedures for agency rulemakings and adjudications, as well as standards for judicial review of final agency actions.

30.      Pursuant to 5  U.S.C. § 553, which governs the informal rulemaking process, agencies are required to provide the public with adequate notice of a proposed rule followed by a meaningful opportunity for interested persons to comment on the rule's content.  Once the comment period has closed, the APA requires the agency to consider the "relevant matter presented" and incorporate into the adopted rule a "concise general statement" of the "basis and purpose" of the final rule.  The agency is obligated to respond to "significant" comments.  The final rule, along with this general statement, must be published in the Federal Register not less than 30 days before the rule's effective date, unless "good cause" is shown.  Further, "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

31.     The APA provides for judicial review of final agency actions for which there is no other adequate remedy in court.  Judicial review may be invoked under the APA if a plaintiff has

suffered a "legal wrong" or is "adversely affected or aggrieved" by any final agency action.  5

U.S.C. § 702.  Courts may hold unlawful and set aside agency actions under a number of

circumstances, including if the action, findings, or conclusions are found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or "without

observance of procedure required by law."  5 U.S.C. § 706.

*Procedural History of the Rule*

32.     FWS develops comprehensive conservation plans and step-down management

plans for refuges.

33.     In 1988, FWS completed a Comprehensive Conservation Plan for the ANWR

("1988 CCP").  A CCP is a plan that gives guidance and direction for the FWS in a particular

area and generally serves as the basis for rules that are subsequently promulgated in accordance

with the CCP.  In that CCP, llamas, along with horses and mules, were recognized as permitted

pack animals on the refuge.

34.     Formal scoping to revise the 1988 CCP was published in a Notice of Intent to

revise the CCP and prepare an EIS in the Federal Register on April 7, 2010 (75 F.R. § 17763).

35.     On August 15, 2011, a Notice of Availability and request for comments on a

Proposed modified CCP and environmental impact study ("EIS") for the ANWR was published

in the Federal Register (76 F.R. § 50490).

36.     In 2011, FWS presented the public with a proposed CCP, revising the 1988 CCP

and draft EIS for a 90-day public review and comment period (the "2011 Proposed CCP"). The

2011 Proposed CCP included a prohibition on domestic sheep and goat use on the refuge based

on the risk of disease transmission to wildlife.

37.     The 2011 Proposed CCP did not include a camelid ban.  It stated "[o]ther domestic animals – includes horses, mules, llamas, etc., allowed per the 1988 plan, would continue to be allowed in the preferred alternative."

38.     After the review period for the 2011 Proposed CCP, a revised/final CCP for the ANWR ("2015 CCP") was issued in which the position concerning llamas changed.  Pursuant to 85 F.R. § 54076, "the original proposed action did not contain a prohibition on pack llama use on the refuge, but after reviewing the public comments and additional scientific literature, and considering the purposes of the Arctic NWR, the Service determined that a change to the CCP was warranted, and incorporated a proposed prohibition into the final EIS."

39.     The 2015 CCP added a ban on domestic camelid use along with domestic sheep and goats on the refuge purportedly "to prevent the spread of disease to wildlife."  The 2015 CCP provided no detail as to the nature of the alleged disease, the alleged disease's transmissibility, or which specific animals allegedly carried the unidentified disease.

40.     After publishing the notice of availability of the revised CCP and final EIS for the ANWR on January 27, 2015 at 80 F.R. § 4303, FWS permitted a 30-day review period.  But despite the significant change concerning llamas, FWS did not provide an additional formal comment period.

41.     During the review period on the proposed 2011 CCP, FWS allegedly received six comments requesting that it prohibit certain domestic pack animals due to their potential threat as a disease vector to wild sheep and goats.  None of the six comments mention camelids generally, nor llamas specifically, as a disease threat.  In fact, there was no mention of llamas or their alleged disease transmissibility from any segment of commenters, including governments, agencies or tribes, non-governmental organizations, individuals, or other sources.

42.     FWS published its Record of Decision on April 3, 2015 concerning the revised/final CCP.  Despite no request to add a camelid prohibition, the Record of Decision accepted the revised 2015 CCP, which included the prohibition of camelid use in the ANWR.

43.     In the Record of Decision, FWS states: "the Service must ensure adequate and effective interagency coordination and public participation during the planning process. Interested and affected parties such as State agencies, tribal governments, Native organizations, non-governmental organizations, and *local and national residents who may be affected by decisions in the Plan must be provided meaningful opportunities to present their views."* (emphasis added).

44.     Further, FWS stated in its regulation to the Rule that "[a]ny closures or restrictions of recreational uses on Alaska refuges must go through extensive public outreach and comment, including publication in the Federal Register."

45.     Despite adding a camelid prohibition to its revised 2015 CCP, and contrary to its statements in the Record of Decision and regulation to the Rule above, FWS did not permit an additional comment period for those impacted by the new camelid prohibition.

46.     There was no notification to, much less solicitation of comments from, the llama user group during the 2015 revised/final CCP process.  The first notification to the llama community of the 2015 CCP banning llamas was in June 2018 from an interaction with an Alaska Bureau of Land Management ("BLM") unit in which Plaintiff Mr. Nuechterlein inquired about llama pack animal use in BLM-managed public lands in Alaska.

47.     The 2015 CCP served as a basis for the formulation of the Rule.  On April 9, 2020, FWS published in the Federal Register, 85 FR 20030, a proposed rule that included a

prohibition on domestic sheep, goat, and camelid pack animals on the Arctic National Wildlife
Refuge.

48.     FWS provided a 60-day comment period on the proposed Rule.  Despite COVID-
related delays, FWS declined to extend that comment period because FWS did not want to
disrupt hunting seasons.  The comment period ended June 8, 2020.

49.     During the 60-day time period, Plaintiffs and others in the llama community
submitted numerous comments and posed questions to FWS.  Specifically, FWS received 53
comments relating to the ANWR regulation prohibiting domestic sheep, goats, and camelids on
the refuge.  FWS failed to adequately respond to these comments and questions.

50.     On May 13, 2020, FWS held a remote public hearing but did not provide adequate
time for comments during the public hearing.

51.     During the comment period on the proposed Rule, Plaintiffs enlisted the
assistance of Alaska Congressman Don Young's office.  At Plaintiff's request, Young's office
served as an intermediary between Plaintiffs and FWS so that Plaintiffs could bring to FWS's
attention its numerous concerns with the proposed ban on camelid use in the ANWR.  FWS
refused to adequately respond to these concerns.

52.     Specifically, Plaintiffs asked FWS, through Congressman Young's office, to
schedule a phone call to discuss Plaintiffs' concerns about the lack of notice and the unsupported
scientific bases of the proposed Rule, but FWS refused to have that discussion.

53.     According to Doug Damberg, FWS Refuge Supervisor of the Alaska North Zone,
the prohibition on commercial use of pack llamas became effective and enforceable immediately
upon approval of the revised/final 2015 CCP.  There was never any opportunity for public
participation with respect to the llama prohibition relating to commercial use.

11

54.     On August 31, 2020, FWS published its final Rule at 85 FR 54076 and 50 CFR

71.  Ignoring Plaintiffs' meritorious objections, the final rule prohibited the use of camelids in

the ANWR.

*Prior Attempts to Ban Llama Use as Pack Animals*

55.     In 1996, llama users challenged a prohibition on the use of llamas as pack animals

in the Kofa National Wildlife Refuge in Yuma, Arizona.  Ultimately, the final rule removed the

ban on the use of llamas as pack animals because there was insufficient evidence of disease

transmission. Llamas are currently allowed in the Kofa National Wildlife Refuge.

56.     In 1997, llama users challenged a camelid ban in the Canyonlands National Park

in Utah, because the ban was based on a false threat of disease transmission.  After a protracted

legal battle, the DOI agreed to eliminate disease transmission as a basis for a prohibition of llama

use in the park (the "Canyonlands Settlement").  Although llamas are currently not permitted on

Canyonlands National Park, that current prohibition is not based on any disease transmissibility.

Thus, the FWS rationale in the current rule of disease transmission as a basis for prohibition in

the ANWR is not only without scientific support, it is contrary to the agency's prior precedent.

57.     In 2019, the U.S. Forest Service initially banned the commercial use of llamas as

pack animals in the Chugach National Forest.  After further review, the U.S. Forest Service

overturned its decision because there was a lack of scientific evidence that pathogens spread

from llamas to wild sheep and goats.  Specifically, the Regional Forester determined that the

final environmental impact statement lacked any valid rationale as to why llamas were the only

domestic livestock species, aside from sheep and goats, identified as a potential vector for

transmission of pathogens to Dall sheep and mountain goats.  Due to this lack of evidence-based

rationale, the ban on llama use was rescinded and references to llamas as potential vectors for the

transfer of pathogens to Dall sheep or mountain goats were removed from the final environmental impact statement.

### Deficiencies in the Rule

58.     Despite requirements to notify affected parties of the sudden inclusion of a prohibition of camelids in the 2015 revised/final CCP, FWS provided no notice to the llama community that the 2015 revised/final CCP contained a prohibition on llama use in the ANWR.

59.     FWS banned commercial use of llamas in the ANWR upon approval of the revised/final 2015 CCP.

60.     In creating the Rule, FWS relied primarily on three risk assessments from British Columbia: Schwantje et al 2003 ("Schwantje"), Garde, Schwantje, et al 2005 ("Garde"), and Centre for Coastal Health 2017 ("CCH 17") (the "Risk Assessments").  None of the Risk Assessment are supported by science.  In fact, Schwantje and Garde clearly state that their disease projections regarding llamas are *hypothetical and unsupported by research or clinical evidence*.

61.     In Schwantje, the Executive Summary states: "Risks from camelids to wildlife in British Columbia remain hypothetical after this risk assessment, as no direct evidence was found to implicate camelids as sources of significant diseases in wildlife in BC or elsewhere."

62.     In Garde, the Executive Summary states: "Conversely, contact between llamas and wild Dall's sheep or goats may result in disease in wild species, but there is insufficient data available to clearly assess the role of camelids as a source of disease at this time."

63.     In CCH 17, the Executive Summary states: "We found that there is high uncertainty about the probability of pathogen transmission from SACs to wild ungulates.  We

found no peer-reviewed publications documenting pathogen transmission from camelids to wild ungulates or to domestic sheep and goats for the identified pathogens."

64.     The Risk Assessments that serve as the basis for the Rule are hypothetical and have not been peer-reviewed.  In fact, highly regarded llama researchers and the American Association of Small Ruminant Practitioners ("AASRP") have specifically *rejected* the validity of these Risk Assessments.

65.     Noted llama research veterinarians, Dr. Murray Fowler of UC Davis (recognized as the founder of the wildlife veterinary specialty) and Dr. LaRue Johnson of Colorado State University rejected the Risk Assessments as unscientifically sound because they project diseases of caprinae species (sheep and goats) on camelid species (llamas and alpacas).  The degree of taxonomic/phylogenetic separation between the sub-order Ruminantia (family Bovidae) and sub-order Tylopoda (family Camelidae) is significant and is based on a number of marked differences, one of which is a lack of shared diseases.  Johnson and Fowler saw this violation as a significant disqualifier, especially since the diseases were projected as hypothetical and not of significance in camelid species.

66.     In 1994, Dr. William Foreyt published pen studies that concluded, "A host-specific pathogen commonly carried by domestic sheep and goats is consistent with the high mortality observed in captive bighorn sheep when commingled with domestic sheep but not when commingled with non Caprinae livestock including cattle, horses, and llamas."  (Foreyt 1992, Foreyt 1994, Foreyt and Lagerquest 1996, Besser et al. 2012).

67.     FWS effectively ignored the results of the Foreyt pen studies and the fact that *Pasturella spp*, a bacteria that can cause infections, were not identified in llamas during these pen studies, while all other test species demonstrated *Pasturella spp* presence.  These pen studies

14

are the reference basis of much of the peer-reviewed research for disease in wild sheep, and should not be minimized.

68.     Further, FWS relied on the conclusion in the Foreyt pen studies that horses and cattle did not pose a disease threat to sheep in determining that horses and cattle do not need to be prohibited from the ANWR.  But FWS ignored the conclusion in those same Foreyt pen studies that llamas do not pose a disease threat to sheep.

69.     In 2016, The Journal of Wildlife Management, through the Western Association of Fish and Wildlife Agencies ("WAFWA"), published an article by Cassirer et al, titled Pneumonia in Bighorn Sheep: Risk and Resilience ("2016 WAFWA Study").  This study reviewed the literature and summarized recent data on management of pneumonia in bighorn sheep.  The study concluded the primary cause of pneumonia in wild bighorn sheep was "a bacterium (M. ovi) host-specific to Caprinae and commonly carried by healthy domestic sheep and goats."  The study cited favorably to the conclusions in the Foreyt pen studies that FWS ignored, stating that "[a] host-specific pathogen commonly carried by domestic sheep and goats is consistent with the high mortality observed in captive bighorn sheep when commingled with domestic sheep but not when commingled with non-Caprinae livestock including cattle, horses, and llamas."

70.     In June 2018, Plaintiff GALA wrote to the Alaska Department of Fish and Game ("ADF&G") regarding the CCH 17 study.  The ADF&G responded that while it financially supported the study, "we have no intentions to promote or support limiting the use of South American camelids on public land in the state of Alaska" because the study presented no new information on what risks camelids may or may not pose to wildlife in Alaska.  ADF&G further stated "[a]fter discussing the document internally and with other biologists from several

15

jurisdictions (including the Western Association of Fish and Wildlife Agency Wild Sheep Work Group – WSWG), we will continue to focus and enhance our evaluation of disease risk from species other than llamas or related camelids.  There is not enough information presented in this report or other current publications to warrant spending additional resources on this issue.  Also, we understand that the WSWG pulled the RA report from their website partially due to some concerns about the report itself.  [ADF&G] currently has no plans to change or focus our disease surveillance efforts related to camelids."

71.     In February 2020 the AASRP issued a pointed policy statement aimed at disqualifying the use of the diseases presented in the CCH 17 as a basis to ban llamas on public lands.  That policy statement was brought to the attention of FWS in written comments during the Rule's comment period.  The statement specifically names the diseases identified in CCH 17 and subsequently published in this Final Rule.  It dismisses each one as undocumented as significant in llamas and not documented as transmissible to wildlife:

> There exists concern that the entry of camelid pack animals (llamas, alpacas) onto public lands poses a potential risk of disease to resident endangered or threatened ungulate populations including Boreal Caribou, Northern Mountain Caribou, Central Mountain Caribou, Southern Mountain Caribou, Bighorn Sheep, Mountain Goat, Dall's Sheep, Stone's Sheep and Roosevelt Elk. The diseases of concern by National Parks and wildlife managers include: Mycoplasma ovipneumoniae, Mannheimia haemolytica, Mycobacterium avium paratuberculosis, Mycobacterium bovis, Pasteurellaspp., contagious ecthyma, bovine viral diarrhea virus (BVDV), and bluetongue virus. Transmission of pathogens from cattle and sheep to wild ungulates under natural conditions has been well documented in the literature. Examples include respiratory disease and fatal pneumonia following contact between domestic and bighorn sheep (Schommer & Woolever, 2008),M. bovis from cattle to elk in Riding Mountain National Park (Garde et al., 2009), and BVDV from cattle to deer (Passler & Walz, 2010). ***However, there have been no peer-reviewed publications documenting pathogen transmission from camelids to wild ungulates or to domestic sheep and goats for the pathogens of concern***. The American Association of Small Ruminant Practitioners is opposed to banning camelid pack animals on public lands until there is scientific justification for this action. (emphasis added).

16

72.     The AASRP is a group of 1,000 practicing, teaching, and research veterinarians that diagnose, treat, and research diseases of sheep, goats, llamas and cervids (both domestic and wildlife species).  Inexplicably, FWS ignored this rebuttal when formulating the Rule and during the comment period.

73.     FWS also did not consult with the llama veterinary research community when creating the Rule.

74.     All of the documentation underlying the Rule, aside from the hypothetical Risk Assessments concerning llamas, focused on M. ovi and its presence in domestic sheep and goats. CCH 17 specifically eliminated M. ovi as occurring in llamas.  Further, this documentation specifically eliminated llamas by name or taxonomic reference as disease threats to wild sheep.

75.     The Risk Assessments stated that there was no documentation of llamas passing disease to other species, domestic or wild, and FWS failed to recognize this in its Rule.  Instead, FWS inappropriately relied on the hypothetical and unsupported statements of the Risk Assessments.

76.     The taxonomic/phylogenetic separation between llamas and wild sheep and goats disqualifies the hypothetical Risk Assessment of Caprinae diseases to Camelidae.  FWS attempts to negate this scientifically accepted principle of taxonomic separation by pointing to hypothetical diseases listed in the Risk Assessments that are rebuked by the relevant scientific community.

77.     Cattle, horses, dogs, and humans pose a greater disease threat to wild sheep and goats than llamas.  But cattle, horses, dogs, and humans are not prohibited from the ANWR.  The Rule impermissibly ignores the disease threat posed by cattle, horses, dogs, and humans to wild sheep and goats.

17

78.     The Rule ignores that the 2016 WAFWA Study concluded that the source of polymicrobial pneumonia pathogens in wild sheep and goats are domestic sheep and goats.

79.     The Rule cites to research and policy position statements which do not support the conclusion that camelids should be banned because they are a disease threat to wild sheep and goats.

80.     The Rule fails to acknowledge the ADF&G letter to GALA eliminating llamas as a disease threat and questioning the validity of CCH 17.

81.     The Rule introduces new documentation (Cassirer et al., Kamathet et al., and CAST 2008) into the final rule, but no opportunity for comment on that new documentation was provided.  The new documentation is focused on M. ovi in sheep and goats, and M. ovi is not identified in llamas.

82.     The Rule fails to acknowledge or consider the Canyonlands Settlement with the DOI and the specific precedent of removing the reference to llama disease transmissibility as a reason for banning them from the land.

83.     The Rule fails to acknowledge or consider the Kofa National Wildlife Refuge decision to overturn its ban on llamas due to lack of disease transmissibility.

84.     The Rule fails to acknowledge or consider the Chugach National Forest decision to overturn its ban on llamas due to the lack of disease transmissibility.

85.     FWS states that its ban of llamas was based partly on six comments it received. None of those six comments reference llamas.

86.     The camelid ban was shepherded by the Wild Sheep Foundation because of self-serving purposes, not disease transmission concerns.  Upon information and belief, the wild sheep industry's efforts to ban the llama are because the packing abilities and other advantages

of llamas pose a threat to the wild sheep industry's private business interests in wild sheep hunting; the Wild Sheep Foundation's objections are not actually because llamas are a disease threat to wild sheep.

87.     The foregoing represents some but by no means all of the ways in which FWS's Rule is arbitrary, capricious, and inconsistent with law.

### COUNT I
### (Procedural Violation of Section 706 of the Administrative Procedures Act)

88.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

89.     The Rule is an order under 5 U.S.C. § 551 that constitutes final agency action under 5 U.S.C. § 704.

90.     Under Section 706(2)(D) of the Administrative Procedures Act, a reviewing court may set aside final agency action found to be "without observance of procedure required by law."  The Rule is not in accordance with law.

91.     The Rule is not in observance of procedure required by law because it is based on a CCP process that violated ANILCA and NEPA by failing to allow public comments on the revised/final 2015 CCP.

92.     Through the actions described in this Complaint, FWS violated the procedural requirements of the APA.  FWS's violation inflicts ongoing harm upon Plaintiffs and other llama users.

## COUNT II
### (Substantive Violation of Administrative Procedures Act)

93.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

94.     The Rule is an order under 5 U.S.C. § 551 that constitutes final agency action under 5 U.S.C. § 704.

95.     Under Section 706(2) of the Administrative Procedures Act, a reviewing court may set aside final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  The Rule is arbitrary, capricious, and not in accordance with law.

96.     The Rule is arbitrary and capricious because the Rule is not supported by scientific research.  Specifically, the basis of the Rule banning llamas is based on research that expressly states that the evidence is inconclusive and hypothetical as to whether llamas spread diseases to wild sheep and goats and is not peer-reviewed or generally accepted in the relevant veterinary scientific community.

97.     The Rule is arbitrary and capricious because the research "supporting" it does not in fact support the conclusions made by FWS.

98.     The Rule is arbitrary and capricious because the Rule targets llamas because they are purportedly a threat to wild sheep and goats, but the Rule does not ban horses, mules, dogs, cattle, or humans, which are known pathogen carriers and pose a greater threat to wild sheep and goats than do llamas.

99.     The Rule is arbitrary and capricious because it ignores the principle of taxonomic separation.

20

100.     The Rule is arbitrary and capricious because it ignores the 2019 decision by the U.S. Forest Service to overturn its ban on llamas in the Chugach National Forest Issue due to lack of scientific evidence supporting a disease threat caused by llamas to wild sheep.

101.     The Rule is inconsistent with law because it is not supported by substantial evidence in the record and is inconsistent with current scientific research.

102.     Through the actions described in this Complaint, FWS violated the substantive requirements of the APA.  FWS's violation inflicts ongoing harm upon Plaintiffs and other llama users.

## COUNT III
### (Declaratory Judgment - Violation of ANILCA)

103.     The preceding paragraphs are incorporated by reference as if fully set out herein.

104.     This Complaint presents an actual controversy regarding the interpretation of ANILCA as it relates to the notice requirements for restricting access to national recreation areas, national conservation areas, and public lands pursuant to Section 1110(a) and the regulations that implement that section, 43 C.F.R § 36.11 and 43 C.F.R. § 36.42.

105.     Pursuant to 28 U.S.C. § 2201(a), to resolve the actual controversies regarding the interpretation and application of this provision of ANILCA and FWS's authority with respect thereto, Plaintiffs seek a declaratory judgment, as set forth below, with respect to the duties and obligations of FWS under ANILCA.

106.     43 C.F.R. § 36.11(a) states that "the use of nonmotorized surface transportation such as domestic dogs, horses and other pack or saddle animals is permitted in areas except where such use is prohibited or otherwise restricted by the appropriate Federal agency in accordance with the procedures of paragraph (h) of this section."

107.    43 C.F.R. § 36.11(h)(1) states that "[t]he appropriate Federal agency may close an area on a temporary or permanent basis to use of aircraft, snowmachines, motorboats or nonmotorized surface transportation only upon a finding by the agency that such use would be detrimental to the resource values of the area."

108.    ANILCA does not authorize FWS to restrict access to the ANWR by nonmotorized surface transportation methods under Section 1110(a) unless, after notice and hearing in the vicinity of the affected unit or area, the Secretary finds that such use would be detrimental to the resource values of the unit or area.  43 C.F.R. § 36.42(e)-(f).

109.    43 C.F.R. § 36.11(ii)(3) requires a "minimum public comment period of 60 days" for permanent closures and permanent closures "shall not be effective until after a public hearing(s) is held in the affected vicinity and other locations as deemed appropriate by the appropriate Federal agency."  The regulation also requires extensive public notice of permanent closures.

110.    The revised/final 2015 CCP is inadequate under ANILCA because FWS failed to provide the necessary notice and hearing required under ANILCA and its regulations.

111.    Because the 2015 CCP violated ANILCA, the Rule prohibiting camelid use in the ANWR is similarly inadequate.

## COUNT IV
### (Declaratory Judgment - Violation of NEPA)

112.    The preceding paragraphs are incorporated by reference as if fully set out herein.

113.    This Complaint presents an actual controversy regarding the interpretation of NEPA as it relates to the notice requirements for public involvement in the revised/final 2015 CCP and rulemaking process, including the regulations that implement NEPA, 40 C.F.R. § 6.203 and 40 C.F.R. § 1506.6.

114. Pursuant to 28 U.S.C. § 2201(a), to resolve the actual controversies regarding the interpretation and application of NEPA and FWS's authority with respect thereto, Plaintiffs seek a declaratory judgment, as set forth below, with respect to the duties and obligations of FWS under NEPA.

115. The revised/final 2015 CCP is inadequate under NEPA because FWS failed to provide the necessary notice required under NEPA and its regulations to the llama community, including Plaintiffs.

116. The Rule is inadequate under NEPA because FWS failed to provide environmental documents supporting the ban on camelids during the comment period as required under 40 C.F.R. § 1506.6(b).

**WHEREFORE**, GALA respectfully requests this Court:

  a.  Hold unlawful and set aside FWS's Rule;

  b.  Declare that the 2015 CCP violated Section 1110(a) of ANILCA, and the regulations implemented at 43 C.F.R. § 36.11 and 43 C.F.R. § 36.42;

  c.  Grant preliminary and permanent injunctive relief against implementation of the Rule;

  d.  Award attorney's fees and costs; and

  e.  Award such other relief as is just.

Dated: October 28, 2020        Respectfully submitted,

FOX ROTHSCHILD LLP


/s/ *Brian W. Stolarz*
Brian W. Stolarz (#466160)
Fox Rothschild LLP
1030 15th Street, N.W.
Suite 380 East
Washington, DC 20005
(202) 461-3100 (telephone)
(202) 461-3102 (facsimile)
Email: bstolarz@foxrothschild.com

Nancy E. Halpern *(Pro Hac Vice Admission Pending)*
NJ State Bar No. 041441-2010
Fox Rothschild LLP
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
(609) 844-7404 (telephone)
(609) 896-1469 (facsimile)
nhalpern@foxrothschild.com

Patrick M. Kane *(Admission Pending)*
N.C. Bar No. 36861
Fox Rothschild LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
(336) 378-5200 (telephone)
(336) 378-5400 (facsimile)
pkane@foxrothschild.com

*Counsel for Plaintiffs*

24